v. Johnson&Johnson I would disagree with that, Your Honor, because all the reps, whether they – because Johnson&Johnson has several subsidiaries that are designed – they have pharmaceutical reps that go out and provide information to physicians. They're still – they all operate under the same constraints. They have to convey the core messages that are developed by a marketing group. They have to call on a list of physicians that's provided to them by Johnson&Johnson. They have to call on those physicians with the requisite number of times that Johnson&Johnson demands. They also are given visual aids that they cannot author, and they're also given clinical reprints. Anything that they say to a doctor has to be approved by Johnson&Johnson. What's the business of McNeil and what's the business of Johnson&Johnson since we're talking about work in support of the business of the employer? Are they different? No, they both – they all sell pharmaceutical products. That's their business. And they don't do anything directly related. I just – I'm perplexed by this because I thought that what she did was she tries to get physicians to prescribe this, this particular drug, but the actual sale that's made is by McNeil to some drug company, you know, wholesale drug company or something, and then there's a further sale in that somebody takes a prescription and buys a drug at a drug store. I mean, what is she selling? I mean, she's trying to convince people. I mean, how is that explained in the opinions? She's trying to convince people to prescribe this, but the sale, she doesn't sell anything and they don't buy anything. Well, I completely agree, Your Honor, and that's why it's our position that she doesn't fit under the outside sales exemptions. I understand that. What explanation is given for that? I mean, she's not selling and they're not buying. Correct. What she's doing is conveying information. What she's acting really is a one-on-one advertisement to a doctor that's conveying the message to a doctor. I've been in doctors' offices where they've given me samples. Yes. But I gather that that would probably be, I don't want to call it a gift, but the company probably gives it to the doctor. You know, they hope to get something back for it, of course, but they give it to them without a charge, I guess. That's correct, correct. But in this case, the product that the plaintiff was selling or promoting in this case is a narcotic, so they couldn't give samples for it. Okay. Judge Jordan has a question. One more on my nickel. I'm trying to find out whether, well, my understanding of the fact is at least, neither side seems to disagree with this, but verify for me if you would. She's responsible for developing a business plan, right? In conjunction with her district manager. Yes, she's got a manager, but it's her area, and she's responsible for coming up with a business plan that will satisfy the company that she's going to drive demand, right? Yes, but I would suggest that that business plan encompasses calling on the physicians that J&J wants her to call on the requisite number of times and conveying the messages that J&J wants her to convey. Certainly there are targets that the company wants met, but it's her plan. She comes up with it. She's responsible for executing it, and her performance and incentives and pay revolve around the successful creation and execution of a plan that will result in more revenue for the company because of higher prescriptions, right? Well, I'm sure that's Johnson & Johnson's argument. Well, as a matter of fact, that's the way it works, isn't it? Well, there's a number of factors that could influence why a physician writes a prescription. I haven't seen any evidence in the record that there was one prescription that the company can say, this is directly because of Patti Lee Smith's efforts. Well, you're not suggesting, are you, Mr. DiChiara? Am I saying your name right, sir? That's correct, yes. That J&J is peopled by irrational businessmen and women. I mean, they wouldn't be paying these pharma reps if they didn't have some experience over time in believing we send these people out and the stuff they do boosts revenue. This is not a charitable organization. Or a masonry institution. Yes, not that either. They're there to make money, and so clearly over a long period of time they're under the belief that this does increase revenue, drive demand. I guess you're suggesting that it doesn't drive demand? No, I'm suggesting that the reps are just a piece of the puzzle. They go out and visit, give the required messages they're supposed to give, ask the required questions they're supposed to give. There's also consumer advertising. There's also medical journals in which this drug appears. So, again, there's numerous factors as to why a doctor is going to prescribe. Even favorable formulary position on a managed care program. If it's going to be cheaper for the patient, for the doctor to prescribe Johnson & Johnson's product, they're more likely to prescribe it because they don't want to have the patient incur greater costs. But if we assume these are sensible business people in the pharmaceutical industry, they're not paying close to $100,000 in cash alone, not to mention benefits, unless they think they're going to get more than that in terms of return by increased demand, right? Logical? I would think so. But, I mean, the reason why they have to pay these money to these reps is it's a highly regulated industry, and these reps can't go off-label. If they do, the companies are subject to heavy fines. Can I ask you a question? Sure. I know the reason it seems like a short amount of time is because you reserved one-third of your time. But I guess I didn't focus on the fact that J&J also has an appeal from the failure of the district court to say that she was under the outside sales representative. What's your argument? I mean, especially in light of your discussion with Judge Jordan, how do you support that holding by the district court that she wasn't an outside sales representative just because she didn't actually complete the sale? Is that the argument? That's exactly it, Your Honor. It's an interaction where you have a rep.  was for the business of the company in its goodwill and getting its name out. It seems to me it doesn't have to be one or the other. No, it doesn't have to be, Judge. The standard under the administrative exemption is she has to perform work that's directly related to the management or general business operations. We're talking at a higher level, developing marketing strategy, developing promotion strategy. She's just delivering a message. She has no role in the development of the message. What's your authority for that, that it has to be at a higher level? DOL opinions. We also have the Fourth Circuit case. When you say the DOL opinions, you're talking about the? DOL letters and also in the DOL amicus brief. Even though they touched really on the second prong of the administrative exemption, they did say that individuals who are not involved in higher-level strategy-making, developing marketing or business strategies are not exempt under the administrative exemption. Thank you very much. We'll get you on rebuttal. Thank you. Thank you. We'll hear from Mr. D. Good morning. May it please the Court. My name is Francis X. D., and I represent Defendant Applee Johnson Johnson. I want to address the administrative exemption. Our position is that the district court properly held that Smith was covered by the administrative exemption from the wage and hour laws. You're not arguing then the cross-appeal on the outside sales representative? Our cross-appeal, Your Honor, was a protective cross-appeal. Our position is that both exemptions apply. The regulations, the DOL regulations, specifically state that both exemptions can be applicable. Quite frankly, if the district court opinion is affirmed on the administrative exemption? You'd be happy. Well, I'll be delighted, and we don't have to get into the sales exemption. Well, let me ask you how you handle the Department of Labor weighing in here, well, not in here, but into the debate generally with its amicus brief up in the Second Circuit. It seems to be just the sort of thing that would make the plaintiff's attorneys delighted because it says these pharma reps, they're not administrative employees, period. Well, first of all, and I think we need to look at it differently with respect to the administrative exemption and the outside sales exemption. The DOL brief in Novartis with respect to the administrative exemption really does not interpret the regulations, and therefore it is not entitled to any weight. It's certainly not a Chevron controlling weight. When you say it doesn't interpret the regulations, you mean, I'm not sure what you mean. It addresses facts. It sure looked to me like they were saying stuff that was exactly on point by talking about a rep's discretion being so limited that it did not permit them to be viewed as administratively exempt. What I'm saying is that's an application of facts to the regulation. It is not an interpretation of the regulation itself. In the DOL brief in Novartis, the DOL does not interpret the regulation itself. It draws a conclusion based upon some very limited facts, and if you look at- So you're saying that it doesn't have any persuasive effect? It doesn't have any Chevron controlling effect. The DOL is the agency responsible for enforcing the Fair Labor Standards Act, isn't that right? That's correct, and their opinions, particularly opinions that go through the regulatory approval process, are given controlling weight under Chevron in certain instances. But in terms of this particular situation with the Novartis amicus brief, with respect to the administrative exemption, the DOL is not interpreting the regulation. It is looking at the facts in Novartis and saying those facts make the reps in Novartis non-exempt. And if you look at the facts- That's the way I understood it, that it's a fact-driven situation. What might be true in one place might not be true in another, depending upon, you know, what the particular arrangement is within the company. Doesn't it all have to be the same? Precisely, Your Honor. Yeah, but weren't they talking about outside pharmaceutical sales reps, period? Isn't that a pretty broad interpretation? I mean, why is Smith different than the rep in Novartis? Very simple, Your Honor. If you look at the record in this case, Smith herself testified that she was responsible for the management of her own business and having the flexibility and independence of being able to basically run my territory the way I saw fit. Her testimony. She created the business plan for her territory. She was responsible for revising it and updating it throughout the year. Precisely what the DOL says in its brief, page 21, as one of the attributes of qualifying somebody for exemption. She evaluated opportunities for market share growth presented by the physicians in her territory and prioritized those opportunities. She planned and executed each sales call based on her knowledge of the physician, prior calls and other information. She determined before each call how to approach the physician using, in her own words, in her deposition, a different strategy for different types of customers. That evidence is not in Novartis. Every physician, according to her, her own testimony, has a button you can push. Judgment. Discretion. The training materials in this case, unlike the training materials in Novartis, say, quote, if you find that you are making identical calls consistently throughout the day, then you are not meeting the company's expectation. That each sales call is a sales discussion uniquely prepared for each customer's needs. This is her testimony. Excuse me. Her testimony. That last item is the sales material that was given to all the sales reps. Because you started with her testimony. I did. So somebody could say that she is subject to the administrative exemption, but the situation is different in Novartis. Maybe it is, maybe it isn't, but it could be. Exactly, Your Honor. You have to look at the facts. That's what I thought. This is not a one-size-fits-all. Somebody seems to think it's one-size-fits-all. I couldn't understand why that would have to be. Well, in terms of the administrative exemption, there really isn't a dispute that promoting a product such as Concerta is, in fact, covered by the administrative exemption as administrative work. It's the second prong. Is she exercising discretion and independent judgment with respect to a matter of significance? But one company could have one thing, one could have a different thing. Precisely. And we have a record here, which I submit, that based upon undisputed training materials, undisputed witness testimony, and most importantly, her own testimony, her own testimony, that she ran her territory, she ran the territory as a business, that she made judgments time and time again. When I asked her in her deposition about her judgments, how did she decide? It was all classic examples of independent judgment and discretion. So what you're telling us, if I can understand it correctly, is that we can't really write a precedential opinion that sets down a rule of law and that it would be factual only as to each case? Is that what you're saying? It's two issues, Your Honor. With respect to the administrative exemption, there are plenty of cases out there now, not in the pharmaceutical industry at the circuit level, but there are plenty of cases I would call on the John Alden line of cases in the First Circuit, cited approvingly in the 2004 preamble to the regulations by the DOL, where precisely this sort of situation, where there's – Well, when you say precisely this sort of situation, that's not the way the DOL viewed it in the Novartis brief, right? I mean, they're at pains to distinguish John Alden and the type of representation that was going on there from what they said the Novartis reps were doing. That's right. But on that record, on the Novartis record, they specify very limited work or discretion that the Novartis reps have. And what I'm saying here is that our record, largely from the plaintiff's own testimony, establishes the kind of discretion and independent judgment that exists in the John Alden line of cases. Shouldn't we look at her testimony as a little bit of puffing about her job? I mean, everybody thinks his or her job is important and it really has something to do with the business. And I'm not sure when she testified that she was aware of the use to which you were putting that testimony. I mean, you know, she said, yeah, I do this and I do that. I would expect somebody to do that. Should we not look at it that way? No, Your Honor. I took her deposition. I didn't think you were going to say yes. No, but I took her deposition. It's a video dep. If you want, we can produce the video. She was not puffing when she was sitting in a witness chair as a plaintiff trying to make her case. I can guarantee you that. Are you saying she knew what the case was about? Sure she knew what the case was about. She's a purported class representative in a case that she is bringing. She knew exactly what it was about. And if you look at her testimony, I mean, I had to subject her to, quote, the crucible of cross-examination to get at the truth. She didn't drop that in my lap. And then we also have other testimony. We have undisputed testimony from other individuals about what happens with other representatives, and we have documentary evidence, some of which I just read to you. I know that your cross-appeal, if I may say, your improper cross-appeal, I've written opinions on this, which gives you the opportunity for an extra brief, because you're a cross-appellant, but that's okay. But it says that, well, anyway, she's also a salesperson. But isn't it true that she doesn't sell anything? All she's trying to do is to get physicians the right prescriptions where people will buy things, which they might give them the prescriptions, they might never even fill it. Not so. And I start to answer that question by looking at the statute. Section 3K of the statute defines sale. And I submit that it defines sale very broadly. And it defines sale as any sale. It then goes into consignment, which is not your traditional sale. But most importantly, it goes into or other disposition. And I submit that in terms of contract construction, Congress deliberately made that definition of sale flexible. And by the way. Are you talking about the outside sales? Yes. I mean, we're switching. Are you talking now about the outside sale exemption that's distinguished from the administrative exemption? That's because Judge Greenberg led me into it, Your Honor. He made me do it. It's just I'd like to keep them separate in my mind if I can. I can't do it. Judge Jordan is hatching a question. Well, have you completed what you wanted to say in response to Judge Greenberg? No, not entirely. First of all, if I may. I start out with Section 3K, which defines, Congress defined sale very broadly. The next thing you look at is that when the DOL addressed sales, the DOL in its regulation came up with making sales. And it defines making sales in the preamble to the regulations as including someone who goes out and obtains a commitment for an order for which that individual is credited. Now, here's the issue. I agree that this is not what we would call a traditional, normal sale where you go into a store, you buy something, you give the money, and you take it out. We agree. But what I'm saying is that Congress intended more than that type of transaction. Well, if Congress had intended it, it could have said it, right? I'm sorry? I said if Congress had intended more, it could have said more, right? I mean, the position you're putting forward has come up short in a number of cases, hasn't it? It's been followed in a number of cases, number one. There are some cases where it came up short, including in my case. This one, right. But in looking at normal canons of contract or, excuse me, statutory construction, you need to look at how the statute is formulated. And that word, that phrase, other disposition, I submit, suggests that Congress must have meant something by that. Otherwise, if we take plaintiff's position, they would write it out of the statute. And that's contrary to canons of statutory construction. But more importantly, the DOL has said in its regulations and in its preamble to the regulations that making sales includes gaining a commitment, soliciting a commitment, and getting credit for that order. As a matter of law here, and by the way, the DOL doesn't even address that in a Novartis opinion. As a matter of law, the prescription is the order. So what we have is Smith going out, soliciting the prescription, namely the order, which is the only way that product can get sold. And she's getting credit for that. That is a sale under the statute. And is that tracked? As a matter of fact, are the number of prescriptions in her territory tracked? It's tracked by increase of market share. But it's not tracked by the numbers that any particular – in fact, I wonder, it would be probably difficult and you might run into privacy regs if you're trying to track it otherwise, right? Exactly. There's no – we've never said that there's a linear connection between her sales and the prescriptions. Can you respond to the point that your opponents make and that is rife through the DOL's Novartis brief that pharma reps are scripted? It's a highly regulated industry. They can't go off-label without running into problems with the FDA, getting the company in trouble. So it has to be scripted. There's no way it can't be scripted in order for them to operate within the law. And therefore, as their argument runs, there really isn't any discretion here. These are highly paid and skilled and probably very nice folks, but they are reading from a script. First of all, this issue of script is only one segment of the pharma rep's duties. I quoted the testimony earlier about how she manages her territory, what else she does, and so on and so forth. I won't bore the court by going into that. So it's just one sliver, and that's when she's with the doctor, what she says. Now, in Novartis, it appears that there were not only scripts. And putting a label on something like this can be dangerous because as you look at the record in Novartis and you look at the record in our case, they all have core messages. We have core messages, but pharma rep can decide which core message you use or which part of a core message and so on and so forth. And that's to help avoid the off-label promotion and things of that nature. But there is discretion in terms of using which core message in our case and to what extent and how to present it. Tailoring messages. I'm sorry? Tailoring messages. Tailoring, using which one fits based upon strategy and judgment and discretion. But here's the issue in Novartis, and this is what I think the DOL focused on, and maybe, I don't know, that's why they're not here, is that they were so scripted, they took the core message and they were so scripted that in delivering the core message, the rep had to use that script. That's not the case in our situation. Council uses the word script, but if you look at the record as what's being talked about in terms of a script, it really isn't anything like Novartis. Thank you, Mr. D. Thank you. Okay. Okay with you? Yeah, I'm good. Thank you. Mr. DiCiara, we'll get your rebuttal. I'm sorry? No, I'm telling Mr. DiCiara. You know, Mr. Di said he would love to play the deposition of plaintiff. So would plaintiffs. We would love to actually have you see it because – Is it in the record? No. Well, her transcript is in the record. The transcript. The transcript. You know, what the defendant is focusing on is really superficial characteristics of her job, saying I could run the business the way I saw fit. It's a very odd way to run a business as you see fit. That's not superficial. Well, let me – That's her statement. I mean, that's your client under oath talking about her job. Right. But if you probe a little further, she can't hire anybody. She doesn't supervise anyone. She has to call in the doctor she's told to call on. She has to call on them the number of times she's told to call on them. She's given segmentation information about each doctor, and that's so specific that it tells her which message she's supposed to deliver to a particular doctor, which visual aid she's supposed to use with each particular physician. That's no way for her to manage a business. So as a factual matter, are you telling us that Mr. D is wrong? Because what I just heard him say to us from this podium, what I took from their briefing too, is that, yes, there are pre-prepared materials, which there have to be in a properly, highly regulated industry like pharmaceuticals, but that it's within the discretion of a skilled salesperson. Now, I'm not making a judgment about whether it fits outside sales or not, but these are, I think, in common parlance, sales reps. They're going out pushing product. They have the capacity to make a judgment about how they are going to put the core message to an individual doctor. You seem to be saying, no, they were told, for this doctor, use this visual aid. For that doctor, use that visual aid. Where is that in the record? That's correct. It is in the record. It isn't? It is. It is in the record. Again, we're talking about discretion and independent judgment over matters of significance. Even if, let's say, for the sake of argument, she did have the choice of which visual aid to use, her primary duty here is to convey information to physicians. Whether she chooses visual aid A or B, it doesn't go to her primary duty. She's not exercising discretion and independent judgment over a matter of significance. Boy, you know, I've worked with a lot of salespeople in my life, and I think they would be shocked to be characterized as automatons. They view themselves, generally speaking, and I'm guessing that she does, too. Well, I'm not guessing it. The record shows she's thinking this way. I'm an independent business person responsible for developing the business in my territory. I own it. I've got to go out there and get the business, and if I don't get it, I don't get paid. The way I want to get paid. And if I do get it, I get the accolades and I get a bigger budget and I get maybe better territory and all the things that flow from it. Those are the sorts of things she's saying in her testimony. Evidently, she doesn't feel like an automaton. Why should we take the spin that you're putting on it and say, yes, she's an automaton? I'm not suggesting that she's an automaton. I think everyone exercises some level of discretion on their job, but just using the phrase discretion doesn't mean that she's exercising discretion under the exemptions. I lost track of my thoughts. I'm sorry. Go ahead. And just real quickly on the outside sales exemption, it's defendant's burden to show that the plaintiff fits plainly, unmistakably within the exemption. Now, for the outside sales, the defendant focuses on other disposition. I think under the doctrine eustem generis, which means of the same kind, that prohibits a broad, expansive definition of the term sales. And the fact that these exemptions are to be narrowly construed, that doctrine should be applied. And, again, it shows that what she does is not sales. There's no exchange of goods. Doesn't enter the contract. Doesn't take orders. No binding. And there's also this testimony about obtaining a commitment. This commitment is completely non-binding. It's a legal oxymoron. It doesn't commit the doctor to prescribing any particular product at all. The other day I got a call for a charity. And I said, send me to court. I'll think about it. And it came yesterday with the amount of the donation I pledged, which I never did. But it worked. I paid it. Sure. Sort of a commitment after all, maybe. It's happened to me, too, Judge. But I would suggest you didn't have to pay it. Like, if you didn't pay it, they weren't going to come after you and say, well, you promised, Judge, that you were going to give us X amount of money. It was to the local hospital. Correct. Thank you very much. Thank you both. It's an interesting case, and we'll take it under advisement. Thank you.